1 | SHEPPARD MULLIN RICHTER & HAMPTON LLP
JUSTINE M. CASEY, Cal. Bar No. 143243
2 | jcasey@sheppardmullin.com
JAMES F. McSHANE, Cal. Bar No. 123178
3 | jmcshane@sheppardmullin.com
DAVID E. DWORSKY, Cal. Bar No, 272167
4 | ddworsky@sheppardmullin.com
650 Town Center Drive, 4th Floor
5 | Costa Mesa, California  92626-1925
Telephone:  714-513-5100
6 | Facsimile:   714-513-5130

7 | SMITH ELLISON, Professional Corporation
MICHAEL W. ELLISON
8 | mellison@sehlaw.com
7700 Irvine Center Drive, Suite 730
9 | Irvine, California 92618
Telephone:  949-442-1500
10 | Facsimile:   949-442-1515

11 | Attorneys for Defendant
SPECIALTY RISK SERVICES, LLC

12 |

13 | UNITED STATES DISTRICT COURT

14 | CENTRAL DISTRICT OF CALIFORNIA

MONARCH CONSULTING, INC. dba PES PAYROLL,

Plaintiff,

v.

SPECIALTY RISK SERVICES, LLC,

Defendants.

SPECIALTY RISK SERVICES, LLC,

Counter-claimant,

v.

MONARCH CONSULTING, INC. dba PES PAYROLL,

Counter-defendant.

Case No. **CV11-01764 DSF (AGR)**

**SPECIALTY RISK SERVICES, LLC'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**[F.R.C.P. 16 AND Local Rule 16-4]**

Pretrial Conference: December 8, 2014
Trial Date:                December 16, 2014

SMRH:434853789.2

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND BACKGROUND .......................................................... 1

    A.    Operative Pleadings ........................................................................... 1

    B.    Summary of the Case ......................................................................... 1

II.   CLAIMS AND DEFENSES [L.R. 16-4.1] ..................................................... 4

         a.    L.R. 16-4.1(a): Summary Statement of the Claims Monarch Has Pleaded and Plans to Pursue ....................... 4

         b.    L.R. 16-4.1(b):  The Elements Required to Establish Monarch's Claims ................................................... 5

         c.    L.R. 16-4.1(c): Key Evidence SRS Will use in Opposition to Monarch's Claims ...................................... 7

         d.    L.R. 16-4(d):  Summary Statement of the Counterclaims and Affirmative Defenses that SRS Has Pleaded and Intends to Pursue .................... 16

         e.    L.R. 16-4.1(e).  The Elements Required to Establish SRS' Counterclaims and Affirmative Defenses .............. 18

         f.    L.R. 16-4.1(f):  Key Evidence in Support of SRS' Counterclaims and Affirmative Defenses. ..................... 22

         g.    L.R. 16-4.1(g):  Other Claims  [Monarch's Affirmative Defenses to SRS' Counterclaims] ................. 24

         h.    L.R. 16-4.1(h):  Identification of Anticipated Issues Regarding Evidence, and SRS' Position as to Those Issues ................................................................ 33

         i.    L.R. 16-4.1(i):  Identification of Issues of Law Germane to the Case, and SRS' Position as to Those Issues. ............................................................... 35

    A.    Monarch Lacks Standing to Assert a UCL Claim for Restitution ........ 36

        1.    Monarch lacks standing because it suffered no injury in fact ..................................................................... 37

        2.    Monarch is not entitled to restitution on any of its UCL claims ............................................................... 37

    B.    Monarch Is Not Entitled to Restitution on any of its UCL Claims ...... 39

    C.    Monarch Is Not Entitled To An Injunction .......................................... 40

III.   L.R. 16-4.2 [Abrogated] ..................................................................41

IV.   L.R. 16-4.3: BIFURCATION OF ISSUES ......................................41

V.   L.R. 16-4.4: JURY TRIAL..............................................................42

VI.   L.R. 16-4.5: ATTORNEYS' FEES....................................................42

VII.   L.R. 16-4.6 ABANDONMENT OF ISSUES....................................43

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

<u>Bank of the West v. Superior Court</u>
  2 Cal.4th 1254 (1992) ...................................................................... 37, 39

<u>Californians for Disability Rights v. Mervyn's, LLC</u>
  39 Cal.4th 223 (2006) ............................................................................. 36

<u>Cel-Tech Communications v. L.A. Cellular Telephone Co.</u>
  20 Cal.4th 163 (1999) ............................................................................. 36

<u>Civic Western Corp. v. Zila Industries, Inc.</u>
  66 Cal.App.3d 1 (1977) ............................................................................. 6

<u>Cortez v. Purolator Air Filtration Products Co.</u>
  23 Cal.4th 163 (2000) ............................................................................. 37

<u>Day v. AT&T Corp.</u>
  63 Cal.App.4th 325 (1998) ................................................................ 37, 38

<u>Desert HealthCare Dist. v. PacificCare FHP, Inc.</u>
  94 Cal.App.4th 781 (2001) ..................................................................... 40

<u>Dinosaur Development, Inc. v. White</u>
  216 Cal.App.3d 1310 (1989) ................................................................... 39

<u>Farmers Ins. Exch. v. Sup. Ct.</u>
  2 Cal.4th 377 (1992) ............................................................................... 40

<u>Farmers Ins. Exch. v. Zerin</u>
  53 Cal.App.4th 445 (1997) ..................................................................... 18

<u>Fiberboard Paper Products Corp. v. East Bay Union of Machinists</u>
  227 Cal.App.2d 675, 39 Cal. Rptr. 64 (1964) .................................... 30, 31

<u>Health Maintenance Network v. Blue Cross of So. Cal.</u>
  202 Cal.App.3d 1043, 249 Cal. Rptr. 220 (1988) ............................... 30, 31

<u>Jonathan Neil & Assoc., Inc. v. Jones</u>
  33 Cal.4th 917 (2004) ............................................................................. 40

SMRH:434853789.2

Korea Supply Co. v. Lockheed Martin Corp.
   29 Cal.4th 1134 (2003) ...................................................................36, 37

Kwikset Corp. v. Superior Court
   51 Cal.4th 310 (2011) ...........................................................................36

McBride v. Boughton
   123 Cal.App.4th 379 (2004) ..................................................................32

McLain v. Octagon Plaza, LLC
   159 Cal.App.4th 784 (2008) ....................................................................7

Moriarty v. Carlson
   184 Cal.App.2d 51, 7 Cal. Rptr. 282 (1960) ...................................30, 31

Reichert v. General Insurance Co.
   68 Cal.2d 822, 69 Cal. Rptr. 321 (1968) ...............................6, 18, 21

Santoro v. Carbone
   22 Cal.App.3d 721, 99 Cal. Rptr. 488 (1972) .................................27, 28

Seligman v. Tucker
   6 Cal.App.3d 691, 86 Cal. Rptr. 187 (1970) ...................................30, 31

Stafford v. Ballinger
   199 Cal.App.2d 289 (1962) ...................................................................30

Stilwell v. Trutanich
   178 Cal.App.2d 614 (1960) ......................................................................6

Tenzer v. Superscope, Inc.
   39 Cal.3d 18 ......................................................................................27, 28

Title Ins. Co. v. State Bd. of Equalization
   4 Cal.4th 715 (1992) ..............................................................................19

In re Tobacco Cases I
   193 Cal.App.4th 1591 (2011) ............................................................41, 42

Troyk v. Farmers Group, Inc.
   171 Cal.App.4th 1305 (2009) ................................................................37

Watson v. Poore
   18 Cal.2d 302 (1941) ........................................................................30, 31

-iv-

<u>Wolf v. Superior Court</u>
    107 Cal.App.4th 25 (2003) ...................................................................... 7

<u>Statutes</u>

Cal. Bus. & Prof. Code § 17200 ................................................................. 6

Cal. Bus. & Prof. Code § 17203 ............................................................... 36

Cal. Bus. & Prof. Code § 17204 ............................................................... 36

Cal. Civil Code § 1717 ...................................................................... 41, 42

Cal. Code Civ. Proc. § 337 ................................................................. 20, 29

Cal. Code Civ. Proc. § 339 ...................................................................... 20

Cal. Code Civ. Proc. § 431.70 ....................................................... 19, 29, 32

Cal. Evid. Code § 623 ......................................................................... 27, 28

Cal. Lab. Code § 3702.1 .......................................................................... 40

Cal. Lab. Code § 3702.7 .......................................................................... 40

<u>Other Authorities</u>

CACI 303 ....................................................................................... 6,18, 21, 28

CACI 336 ................................................................................... 20, 26, 27, 28

CACI 338 .................................................................................................. 20

CACI 358 .................................................................................................. 19

CACI 372 ............................................................................................ 18, 19

CACI 405 .................................................................................................. 26

California Forms of Jury Instruction MB 300F.27, p. 3F-38 (Matthew Bender 2011) ............................................................................................. 27, 28

California Forms of Jury Instruction MB 300F.29, p. 3F-43 (Matthew Bender 2011) ............................................................................................. 30, 31

Schwing, A.T., <u>California Affirmative Defenses</u> § 9.4 (West, 2011) ..................... 25

Schwing, A.T., <u>California Affirmative Defenses</u> § 34.10 (West, 2011)...........27, 28

Schwing, A.T., <u>California Affirmative Defenses</u> § 45:18 (West, 2011)...........30, 31

SMRH:434853789.2

Case No. CV11-01764 DSF (AGR)

SRS' MEMORANDUM OF CONTENTIONS
OF FACT AND LAW

**TO THE COURT, AND TO PLAINTIFF AND COUNTER-DEFENDANT MONARCH CONSULTING, INC. dba PES PAYROLL ("MONARCH") AND ITS ATTORNEYS OF RECORD:**

Under F.R.C.P. 16 and Local Rule 16-4, Defendant and Counterclaimant Specialty Risk Services, LLC ("SRS") submits this Memorandum of Contentions of Fact and Law.

## I.
## INTRODUCTION AND BACKGROUND

### A.  Operative Pleadings

The operative pleadings in this case are:

    a.    Monarch's Complaint, filed on March 1, 2011 (ECF Doc. 1).

    b.    SRS' Answer, filed on June 6, 2011 (ECF Doc. 13).

    c.    SRS' Counterclaim, filed on June 6, 2011 (ECF Doc. 13).

    d.    Monarch's Answer to SRS' Counterclaim, filed on June 27, 2011 (ECF Doc. 18).

### B.  Summary of the Case

From 2003 through 2010, Monarch obtained workers' compensation insurance from AIG-related companies under a series of "large deductible" policies (collectively, the "Policies") that set forth the terms of Monarch's workers' compensation insurance program.  The Policies required Monarch to reimburse losses paid and expenses incurred on claims, up to the applicable deductible amount.

In 2005, Monarch selected SRS to serve as the Third-Party Administrator ("TPA") to administer its workers' compensation claims under the

-1-

Case No. CV11-01764 DSF (AGR)
SRS' MEMORANDUM OF CONTENTIONS
OF FACT AND LAW

1   Policies.  To that end, Monarch entered into its first Claim Service and Funding

2   Agreement ("CSA") with SRS effective October 21, 2005 through October 21, 2006

3   (the "2005 CSA").  In addition to the CSA, Monarch and SRS entered into a

4   "Performance Guarantee" agreement effective October 21, 2005 through

5   October 21, 2006 (the "2005 Performance Guarantee").

6

7            In October 2006, Monarch entered into a second CSA with SRS,

8   effective October 21, 2006 through October 21, 2007.  In 2008, Monarch and SRS

9   negotiated an "Amendment No. 1" (the "Amendment") to the 2006-2007 CSA,

10   incorporating the 2006 CSA by reference and describing certain additional and/or

11   amended terms.  The Amendment stated that the 2006 CSA remained in effect

12   between October 21, 2007 and October 21, 2009.[1]

13

14            The parties dispute the terms of their agreement from October 21, 2009

15   through October 21, 2010.  SRS contends that Monarch renewed its program under

16   the same terms, with the exception of certain amendments clarified in the Sold Fees

17   letter sent from SRS Account Manager Cheryl Vanden Heuvel to Monarch's former

18   CFO, Scott Bowen, on January 5, 2010.  Monarch alleges that, After October 21,

19   2009, the parties entered into an *Oral* Agreement to renew the CSA for another year

20   with certain amended terms.  The parties did not enter into any other oral or written

21   agreements. SRS continues to administer open claims that Monarch's workers filed

22   between 2005 and 2010.

23

24

25

26   [1]   SRS' account manager testified at deposition that she recalled Monarch executing
         the 2007 Amendment.  To date, the parties have been unable to locate a fully
27        executed copy of the Amendment.  Monarch, however, pleads in its Complaint that
         the 2007 Renewal Amendment contained the operative terms of the agreement
28        between the parties for the term beginning on October 21, 2007.

Under each CSA, SRS agreed to perform certain TPA administrative services on Monarch's workers' compensation claims, and in return, Monarch agreed to pay SRS certain amounts, including deposit service fees, administration fees and service charges.  SRS also entered into separate annual Claim Service Agreements with AIG, which set forth certain terms applicable to SRS' handling of Monarch's claims

From 2005 through approximately 2007, AIG billed Monarch in order to obtain reimbursement for the losses and expenses, within the applicable deductible amounts, on claims submitted under the Policies (the "Carrier Bill" arrangement).  In 2007, AIG requested that SRS send its invoices directly to Monarch (the "Direct Bill" arrangement).  The Direct Bill arrangement was confirmed in the Amendment, which described changes to the CSA for the October 2007 through October 2009 time period.

Due to an oversight, the implementation of the Direct Bill arrangement was delayed.[2]  Although Monarch was fully aware of the claims losses that continued to be paid and expenses that continued to be incurred, it never disclosed to AIG or SRS that bills were not being received.  Eventually, in addition to the claim services fees that SRS billed Monarch under the CSAs, SRS began invoicing for the losses and expenses paid on Monarch's workers' claims pursuant to the Direct Bill arrangement.  Once SRS began invoicing Monarch under the Direct Bill arrangement, a catch up invoice issued that included the prior months that had not been billed.  In June/July of 2009, Cheryl Vanden Heuval, SRS' account manager,

---

[2]  For a number of months at the outset of the Direct Billing arrangement, invoices were not provided to Monarch.  The error was identified and complete invoices, with back-up documentation, were provided to Monarch.

met with Monarch to discuss the outstanding bills and worked out a payment plan. Subsequently, SRS received a check from Monarch in the amount of $50,000.

Instead of paying the remaining amounts owed, as it represented it would, Monarch delayed and made excuses.  Monarch made a few payments on current invoices in September, October and November of 2009, but claimed that it believed the amounts reflected on SRS' catch up invoices had already been billed by and paid to AIG.  When that turned out to be untrue, Monarch claimed that SRS mishandled its claim files resulting in overpayments.  Monarch's refusal to pay SRS' invoices was a material breach of the CSAs.  Based upon Monarch's breach, SRS issued written notice to Monarch that SRS was terminating its services under the CSAs.  After the letter of termination, other than a few additional payments in May of 2010, Monarch has failed and refused to pay the amounts due for unpaid service fees and outstanding claim losses and expenses.

Presently, Monarch owes SRS in excess of **$1.1 million** in service fees and claims losses and expenses, and owes nearly $3 million overall.

## II.
## CLAIMS AND DEFENSES
### [L.R. 16-4.1]

    a.    **L.R. 16-4.1(a): Summary Statement of the Claims Monarch Has Pleaded and Plans to Pursue**

Monarch's remaining causes of action include: (1) breach of contract; (2) violation of California's Unfair Competition Law ("UCL"); and (3) Accounting.[3]

## Claim 1: SRS Breached its Contract with Monarch

Monarch contends that SRS breached the parties' CSAs and the purported oral agreement by, among other things, "mishandling claims made under the agreements, over-reserving claims made under the Policies, over paying on claims made under the Policies, failing to reasonably and timely investigate claims made under the Policies, failing to provide adequate legal counsel for purposes of defending Monarch against the claims, and failing to communicate with Monarch before settling claims."

## Claim 2: SRS Engaged in Unfair Business Practices in Violation of Business & Professions Code Sections 17200 *Et. Seq.*

Monarch contends that SRS engaged in "unlawful, unfair and/or deceptive business practice" relating to SRS' fees for bill review services which are clearly contained in the CSAs negotiated by the parties.

## Claim 3: SRS Owes Monarch an Accounting

Monarch contends that SRS is "legally obligated" to account to Monarch by providing the requested documentation relating to the workers' compensation claims SRS handled.

### b.   L.R. 16-4.1(b):  The Elements Required to Establish Monarch's Claims

---

[3] Monarch voluntarily dismissed its claim for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing (ECF Doc. 39), and the Court granted summary judgment on Monarch's claim for Declaratory Relief (ECF Doc. 73).

Case No. CV11-01764 DSF (AGR)

SRS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## Claim 1:  Breach of Contract

To prevail on its breach of contract claim, Monarch must prove that: (1) SRS and Monarch entered into written or oral agreements; (2) Monarch did all, or substantially all, of the significant things that the contracts required Monarch to do, or that Monarch was excused from doing those things; (3) all conditions required by the contracts for SRS' performance had occurred or were excused; (4) SRS failed to do something that the contracts required it to do; and (5) Monarch was harmed by that failure.  Judicial Council of California Civil Jury Instructions ("CACI") 303; Reichert v. General Insurance Co., 68 Cal.2d 822, 830, 69 Cal. Rptr. 321, 325 (1968).

## Claim 2:  Unfair Business Practices

To prevail on its Unfair Competition Law counterclaim, Monarch must prove that:  (1) it has suffered an injury in fact and has lost money or property as a result of unfair business practices by SRS; and (2) SRS has engaged or proposes to engage in "unfair competition," meaning an unlawful, unfair or fraudulent business act or practice.  Cal. Bus. & Prof. Code § 17200.

## Claim 3:  Accounting

An accounting claim for relief requires pleading and proof of facts showing that "the nature of the relationship requires an accounting and that some balance is due the plaintiff."  Stilwell v. Trutanich, 178 Cal.App.2d 614, 620 (1960). California courts have interpreted this requirement to mean that an accounting claim for relief is appropriate only when a fiduciary relationship exists between contracting parties, or where the "accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable."  Civic Western Corp. v. Zila Industries, Inc., 66 Cal.App.3d 1, 14 (1977).

California courts limit accounting relief to claims by parties to a fiduciary or other close relationship, such as parties to a profit-sharing agreement. McLain v. Octagon Plaza, LLC, 159 Cal.App.4th 784, 806-07 (2008); see also Wolf v. Superior Court, 107 Cal.App.4th 25, 34-35 (2003) (reaffirming the long-standing principle that "a party to a profit-sharing agreement may have a right to an accounting . . . when such a right is inherent in the nature of the contract itself.").

        c.    **L.R. 16-4.1(c): Key Evidence SRS Will use in Opposition to Monarch's Claims**

**Claim 1:  Key Evidence SRS will use in Opposition to Monarch's Breach of Contract Claim**

Monarch must prove the elements identified below:

**Element (1):**  SRS and Monarch entered into a contract.

**SRS' evidence in opposition:**  SRS will show through documents and testimony that, from October 21, 2005 through October 21, 2007, Monarch and SRS entered into signed and executed CSAs that contained unambiguous terms, which were subject to an enforceable integration clause.  SRS also provided Monarch with a Performance Guarantee for the 2005-2006 year relating to its handling of Monarch's claims.

In 2008, the parties negotiated "Amendment No. 1" to the CSAs, which incorporated the 2006 CSA by reference and described certain additional and/or amended terms for the period from October 21, 2007 through October 21, 2009. The Amendment stated that the 2006 CSA remained in effect between October 21, 2007 and October 21, 2009.

The parties dispute the terms of their agreement from October 21, 2009 through October 21, 2010.  SRS contends that Monarch renewed its program under the same terms, with the exception of certain amendments clarified in the Sold Fees letter sent from SRS Account Manager Cheryl Vanden Heuvel to Monarch's former CFO, Scott Bowen, on January 5, 2010.  Monarch alleges that, after October 21, 2009, the parties entered into an *Oral* Agreement to renew the CSA for another year with certain amended terms.  The parties did not enter into any other oral or written agreements.

**Element (2):**  Monarch did all, or substantially all, of the significant things that the contract required Monarch to do, or that Monarch was excused from doing those things.

**SRS' evidence in opposition:**  SRS will show through documents and testimony that it sent Monarch invoices reflecting the amounts due under the CSAs and all written and/or oral amendments thereto (as described above), and sent Monarch loss and expense invoices to obtain payments of amounts due for losses paid and expenses incurred under the Policies.  Monarch did not do what the contracts required Monarch to do.  Namely, Monarch failed and refused, and continues to fail and refuse, to pay all amounts due under the invoices.  Monarch also failed to timely raise any claims of mishandling or overpayment, as required by the parties' agreements.

**Element (3):**  All conditions required by the contract for SRS' performance had occurred or were excused.

**SRS' evidence in opposition:**  SRS will show through documents and testimony that it had no duty to perform under the contracts once Monarch stopped paying SRS' invoices.

**Element (4):**  SRS failed to do something that the contract required it to do.

**SRS' evidence in opposition:**  SRS will show, through documents and percipient and expert witness testimony, including the agreements and correspondence relating thereto, that it complied with its express and implied contractual obligations when handling the workers' compensation claims submitted by Monarch's injured workers.

Nonetheless, Monarch's Complaint alleges that SRS mishandled 47 of its 374 workers' compensation claims.

The parties have had their respective experts review all 47 claims. Monarch's experts' reports follow a familiar pattern of finding exorbitant damages based on mischaracterizations of law, fact, or both.  SRS' expert concluded that Monarch's experts have over-reached to a ridiculous extreme.  SRS will rely on its expert's reports to make the following points:

First, Monarch's experts ignore facts and documents, and repeatedly indulge in assumption and speculation that borders on fantasy – using qualifying phrases such as "potentially" and "assuming."  Often, Monarch's experts' reports specifically *contradict* facts contained in Monarch's own internal claim files.

1      Second, while SRS' expert found some minor mistakes and/or

2  inadvertent overpayments in a few of the claim files, those errors had nowhere near

3  the enormous, unsupported financial impact claimed by Monarch's experts.

4

5      Third, Monarch's expert blames SRS for mishandling claims while

6  failing to even acknowledge that Monarch self-administered claims in violation of

7  California workers' compensation law – in some instances, not reporting injuries for

8  weeks or months after they had occurred, despite its obligation to do so.  In certain

9  cases, Monarch only reported the claims after significant medical treatment had

10  been rendered and it was clear that Monarch's investigator and its Risk Manager

11  were not going to be successful at bullying the injured worker into dropping his/her

12  claim.  In a few instances, to Monarch's dismay, SRS learned of a claim's existence

13  from the physician rendering treatment to the injured worker.  Worse yet, when

14  Monarch did report the claim, it failed to provide SRS with information that was

15  relevant to determining the injured worker's benefits.  Monarch's late reporting, self-

16  administration of claims and failure to provide necessary information breached

17  Monarch's obligations under the CSAs and California law.

18

19      Fourth, each of the At-Issue Claims was an admitted injury, meaning

20  Monarch acknowledged that a work-related accident occurred involving its

21  employee.  Once Monarch concedes that an admitted injury has occurred (one that

22  arises out of and occurs in the course of employment – AOE/COE), the only

23  remaining issue is to determine the injury's nature and extent, and payment of

24  benefits due.  Instead of acknowledging that all the At-Issue Claims were admitted

25  injuries, however, Monarch's experts inaccurately suggest that some of the injuries

26  could have been wished away, or meaningfully reduced in severity, by faster or

27  better investigation, a different handling of the medical treatment process or by

28  blaming a third party.  Monarch's experts are dead wrong.

Case No. CV11-01764 DSF (AGR)

1        Fifth, Monarch's experts' opinions ignore Monarch's inextricable

2    involvement in the handling of its claims.  Even worse, Monarch's experts attempt to

3    hold SRS responsible for actions that it did not take, and some actions of which SRS

4    was not even aware, until they were a *fait accompli*.  Many of Monarch's experts'

5    criticisms are directed at decisions that Monarch's Risk Manager made or directions

6    that Monarch's Risk Manager gave with respect to the handling or resolution of

7    particular claims.  It is undisputed that Monarch has continuous access to

8    information regarding its claims via SRS' on-line claims system, "@venture," which

9    Monarch's Risk Manager utilizes to keep track of claims and claim payments.  SRS'

10   adjusters also dutifully notify Monarch when reserves or settlements exceed certain

11   thresholds.  Monarch, in many cases, dictated how it wanted claims handled –

12   including, for example, challenging injured Hispanic employees' legal alien status if

13   they filed a claim, assigning its own investigator to try and discredit injured workers

14   and instructing defense counsel to undertake certain tasks, including settling claims,

15   without consulting the claims handler.

16

17       Sixth, Monarch insisted on using a defense attorney, Michael Mazurek,

18   who sent unprofessional correspondence that attacked the injured workers'

19   attorneys, doctors rendering medical care, Social Security Administration employees

20   and, at times, the adjusters handling the claims.  Aside from being unprofessional,

21   Mr. Mazurek's tirades contain inaccurate facts and incorrect law and adversely

22   impacted the outcome of certain claims.  Even Monarch's expert was forced to

23   concede at his deposition that Mr. Mazurek's behavior was unprofessional and

24   detrimental to at least one claim (Estrada).  Monarch concedes that SRS advised it

25   of Mr. Mazurek's antics, yet Monarch still required that he be assigned to defend its

26   claims.

27

28

Case No. CV11-01764 DSF (AGR)

SRS' MEMORANDUM OF CONTENTIONS
OF FACT AND LAW

1          Monarch's experts' reports repeatedly cite conduct engaged in by Mr.

2    Mazurek (sometimes with the blessing of Monarch's Risk Manager, Aldo

3    Cammarota) as causing damage or, as they refer to it, "leakage" in the claim files.

4    For example, Monarch's experts' reports often challenge the settlement of claims.

5    Monarch was not only aware of many of the settlements that its experts now claim

6    were overpaid, but Mr. Cammarota was often the person authorizing defense

7    counsel to settle those claims *without even discussing the settlement with the SRS*

8    *personnel handling the file*.

9

10         On some claims, in contravention to the parties' agreements, Monarch

11    negotiated settlements directly with the attorney without even *involving* the claims

12    adjuster.  Despite Monarch's blatant violations and breach of the CSAs, its expert

13    now challenges the settlements on those claims.  Monarch hand selected and

14    directed defense counsel on those claims.  Its expert repeatedly second-guesses and

15    criticizes conduct, recommendations and decisions made by defense counsel, even

16    though that defense counsel was carrying out *Monarch's* directives and instructions,

17    and *blames SRS for the purported "damages" as a result of such conduct.*

18

19         Finally, Monarch has made other factual and legal misrepresentations

20    throughout this action.  For example, the CSAs specifically provide that Monarch

21    opted/elected and agreed to pay Medical Bill Repricing ("MBR") at 27% of the

22    difference between the billed charges and the actual amount paid on each bill

23    (sometimes referred to as "27% of savings").  Despite a contract between the parties

24    which clearly confirms and spells out the MBR procedure, Monarch's experts allege

25    that SRS' MBR fees are excessive and resulted in damages to Monarch – even

26    though they were calculated in conformance with the CSAs.[4]  Monarch instructed its

27

28    [4]    SRS has filed a Motion *in Limine* to preclude Monarch from introducing any
      evidence that some "other" MBR option was advertised and/or agreed to.

SMRH:434853789.2                             **SRS' MEMORANDUM OF CONTENTIONS**
                                                **OF FACT AND LAW**

1 | expert to "assume" that MBR should have been calculated on a "per bill" basis,
2 | which differs entirely from the "percentage of savings" method agreed to by the
3 | parties in the CSAs.  In other words, Monarch's experts again apply the wrong
4 | standard in evaluating SRS' conduct.

6 |      A possible explanation for why Monarch's experts' reports miss the
7 | mark so badly may be that Monarch instructed its experts to "audit" the claim files
8 | applying the ***wrong standard***.  Instead of applying the contractual standard agreed to
9 | by the parties, Monarch's experts conclude that SRS mishandled the claims because
10 | SRS' conduct did not comport with "Best Practices."  Monarch's experts' reliance on
11 | "Best Practices" is, at best, misplaced.  As Monarch well knows, "Best Practices"
12 | are instituted by a company in order to set goals for its staff to meet.  They are not,
13 | and have never been, the standard against which claims handling should be judged
14 | to determine whether there has been a breach of the CSAs.  The CSAs define the
15 | standards applicable to SRS' handling of Monarch's claims – nowhere in the CSAs
16 | are "Best Practices" even mentioned.  The CSAs provide that claims are to be
17 | handled "in accordance with ***accepted practices and applicable state law governing***
18 | ***claims practices***." More importantly, Monarch's experts were told by Monarch's
19 | counsel to rely on the "Best Practices" he provided.  The "Best Practices" provided
20 | and relied upon by Monarch's expert were published in December of 2009, years
21 | after the majority of the allegedly "damaging" conduct occurred.

23 |      In short, Monarch's experts' revisionist history, over-reaching, rank
24 | speculation and ill-founded assumptions are inconsistent with the actual facts of the
25 | claim files and demonstrate a complete lack of credibility.  The reports, which have
26 | no basis in fact and routinely mis-cite or misapply the law, appear designed for the
27 | sole purpose of supporting Monarch's unfounded attempt to avoid paying SRS (and
28 | the insurance carrier) the millions of dollars it owes.

-13-

SRS will also rely on documents and testimony to show that Monarch knew about the 27% MBR charge and did not challenge its enforceability until it became dissatisfied with the amounts it was being charged.  SRS did *exactly* what the contracts required it to do – handle Monarch's claim and bill it for services rendered.  It could not have breached the parties' CSAs by simply billing Monarch *for a cost it explicitly agreed to pay*.

Finally, SRS will show through documents and testimony that it did not breach the CSAs by terminating its agreement with Monarch, because Monarch's nonpayment of amounts owed constituted an affirmative breach by *Monarch*.

**Element (5):**  Monarch was harmed by that failure.

**SRS' evidence in opposition:**  SRS will show, through percipient and expert witness testimony and documents, including evidence from Monarch's own experts, that Monarch did not suffer any monetary damages as a result of SRS' claims handling.  The reason is simple -- even accepting *all* of Monarch's expert's claims handling criticisms as true, Monarch would *still* be in arrears for over $1 million.  The only party that can possibly recover compensatory damages in this case is SRS.  The question is simply how much.

### Claim 2:  Key Evidence SRS will use in Opposition to Monarch's UCL Claim

Monarch must prove the elements identified below.

**Element (1):**  Monarch has suffered an injury in fact and has lost money or property as a result of unfair business practices by SRS.

**SRS' evidence in opposition:**  SRS will show, through percipient and expert witness testimony and documents, including evidence from Monarch's own experts, that Monarch has not lost money or property as a result of SRS' claims handling.

In its first UCL claim, Monarch contends that SRS' claims handling resulted in artificial increases in the collateral and premium obligations that *it owes to AIG*.  Monarch's allegations establish that AIG, not SRS, purportedly benefitted – through the possibility of higher premiums and collateral requirements – from SRS' alleged mishandling.  Monarch's allegations concede that any payments were made to AIG.  Monarch's admission that AIG, not SRS, received the alleged illicit profits from SRS' misconduct confirms that Monarch has not suffered an injury-in-fact for which it can recover against SRS.

In addition, Monarch did not suffer any damages as a result of SRS' claims handling.  The reason is simple – even accepting *all* of Monarch's expert's claims handling criticisms as true, Monarch would *still* be in arrears for over $1 million.  The only party that can possibly recover compensatory damages in this case is SRS.  The question is simply how much.

In its second UCL claim, Monarch alleges that it was overcharged for bill review fees.  While it is true that Monarch was invoiced for medical bill review expenses, in accordance with the CSAs, the undisputed evidence is that Monarch *has not paid SRS* for the allegedly overbilled fees.  Because it has not yet parted with the amounts it seeks to recover, it has not made an *actual payment* of money, has not suffered injury in fact, and lacks standing to pursue its UCL claim.

1    **Element (2):**  SRS has engaged or proposes to engage in "unfair

2    competition," meaning an unlawful, unfair or fraudulent business act or practice.

3

4    **SRS' evidence in opposition:**  SRS hereby incorporates its summary

5    of the evidence it will offer in opposition to Monarch's breach of contract claim,

6    described above.  That same evidence also refutes Monarch's claim for an alleged

7    violation of the UCL.

8

9    **Claim 3:  Key Evidence SRS will use in Opposition to Monarch's**

10   **Accounting Claim**

11   Monarch must prove that the nature of its relationship with SRS

12   requires SRS to provide it an accounting and that some balance is due Monarch.

13

14   **SRS' evidence in opposition:**  SRS will show through documents and

15   testimony that it is not a fiduciary of Monarch, and that there is no other "special"

16   relationship that would justify an accounting.  Monarch claims only that SRS

17   improperly invoiced it for certain fees and charges, and SRS denies those claims.

18   Monarch cannot meet its burden of demonstrating the existence of a relationship of

19   the sort that would justify an accounting claim.

20

21   d.    **L.R. 16-4(d):  Summary Statement of the Counterclaims and**

22   **Affirmative Defenses that SRS Has Pleaded and Intends to**

23   **Pursue**

24   SRS' Counterclaims and Affirmative Defenses are as follows:

25

26   **Counterclaim 1**:  SRS contends that Monarch breached its contract

27   with SRS based on Monarch's failure to pay over $1.1 million in service fees and

28   claims losses and expenses.

-16-

1    **Counterclaim 2**:  SRS contends that within the past four years,
2    Monarch became indebted to SRS on an open account for money due for services
3    provided and for claims losses and expenses.  Monarch has failed and refused and
4    continues to fail and refuse to pay any portion of the sums owed to SRS, although
5    demands have been made therefor.

6

7    **Counterclaim 3**:  SRS contends that within the past four years,
8    Monarch became indebted to SRS for money paid by SRS for claims losses and
9    expenses paid by SRS to Monarch's injured employees at Monarch's request, and
10   with Monarch's consent and on Monarch's behalf.  Monarch has failed and refused
11   and continues to fail and refuse to pay any portion of the sums owed to SRS,
12   although demands have been made therefor.

13

14   **Affirmative Defense 1**: Right to Offset
15   **Affirmative Defense 2**: Failure to Mitigate Damages
16   **Affirmative Defense 3**: Statute of Limitations
17   **Affirmative Defense 4**: Adequate Remedy at Law
18   **Affirmative Defense 5**: Waiver/Estoppel
19   **Affirmative Defense 6**: Late Notice
20   **Affirmative Defense 7**: Failure to Perform Contract Obligations
21   **Affirmative Defense 8**: Proximate Cause by Monarch
22   **Affirmative Defense 9**: Punitive Damages – Failure to State a Claim
23   **Affirmative Defense 10**: Punitive Damages – Procedural Due Process
24   **Affirmative Defense 11**: Punitive Damages –Protection From
25   Excessive Fines
26   **Affirmative Defense 12**: Punitive Damages – No Ratification
27
28

     **e.**    **L.R. 16-4.1(e).  The Elements Required to Establish SRS'**
           **Counterclaims and Affirmative Defenses**

**Counterclaim 1: Breach of Contract.  Elements Required to
Establish SRS' Breach of Contract Counterclaim**

To prevail on its breach of contract claim, SRS must prove that:
(1) SRS and Monarch entered into a contract; (2) SRS did all, or substantially all, of
the significant things that the contract required SRS to do, or that SRS was excused
from doing those things; (3) all conditions required by the contract for Monarch's
performance had occurred or were excused; (4) Monarch failed to do something that
the contract required it to do; and (5) SRS was harmed by that failure.  CACI 303;
<u>Reichert v. General Ins. Co.</u>, 68 Cal.2d 822, 830, 69 Cal. Rptr. 321, 325 (1968).

**Counterclaim 2: Money Due on Open Account.  Elements Required
to Establish SRS' Counterclaim For Open Book Account**

To prevail on its claim for money due on open account, SRS must
prove that:  (1) Monarch and SRS had financial transactions; (2) SRS kept an
account of the debits and credits involved in the transaction(s); (3) that Monarch
owes SRS money on the account; and (4) the amount of money that Monarch owes
SRS.  CACI 372; <u>see</u> <u>Farmers Ins. Exch. v. Zerin</u>, 53 Cal.App.4th 445, 460 (1997).

**Counterclaim 3: Money Paid.  Elements Required to Establish
SRS' Counterclaim for Money Paid**

To prevail on its counterclaim for Money Paid (Goods and Services
Rendered), SRS must prove that:  (1) Monarch requested, by words or conduct, that

-18-

1  SRS perform services for the benefit of Monarch; (2) that SRS performed the

2  services as requested; (3) that Monarch has not paid SRS for the services; and

3  (4) the reasonable value of the services that were provided.  CACI 372; see Title Ins.

4  Co. v. State Bd. of Equalization, 4 Cal.4th 715, 731 (1992).

5

6  **Affirmative Defense 1: Right to Offset.  Elements Required to**

7  **Establish SRS' Affirmative Defense of Set-Off**

8

9  In order to establish its affirmative defense of set-off, SRS must prove

10  that (1) Monarch owes SRS money, and (2) the amount.  If SRS meets that burden,

11  the amount proven may be set-off against any amounts that SRS owes to Monarch.

12  Cal. Code Civ. Proc. § 431.70.

13

14  **Affirmative Defense 2: Failure to Mitigate.  Elements Required to**

15  **Establish SRS' Affirmative Defense of Failure to Mitigate**

16

17  In order to establish that Monarch failed to mitigate damages, SRS

18  must establish that the damage suffered by Monarch could have been avoided with

19  reasonable efforts or expenditures.  CACI 358.

20

21  **Affirmative Defense 3: Statute of Limitations.  Elements Required**

22  **to Establish SRS' Affirmative Defense of Statue of Limitations**

23

24  To prevail on an affirmative defense of statute of limitations, SRS must

25  prove that Monarch's lawsuit was not filed within the time set by law.  To succeed

26  on this defense, SRS must prove that Monarch's claimed harm relating to any

27  written contract occurred before March 1, 2007, and that Monarch's claimed harm

28

1  relating to any oral contract occurred before March 1, 2009.  CACI 338; Cal. Code

2  Civ. Proc. §§ 337, 339.

3

4      **Affirmative Defense 4: Adequate Remedy at Law.  Elements**

5      **Required to Establish SRS' Affirmative Defense of Adequate**

6      **Remedy at Law**

7

8          SRS asserted this legal defense so that it can demonstrate that Monarch

9  is not entitled to any injunctive relief, because any harm it suffered as a result of any

10  purported claims mishandling may be remedied by the payment of money, rendering

11  injunctive relief unnecessary.

12

13      **Affirmative Defense 5: Waiver/Estoppel.  Elements required to**

14      **establish SRS' Affirmative Defense of Waiver/Estoppel**

15

16          The elements of waiver require SRS to prove that:  (1) Monarch knew

17  it was required to challenge SRS' invoices within ninety (90) days, and (2) Monarch

18  knowingly gave up its right to challenge those invoices.  A waiver may be oral or

19  written or may arise from conduct that shows that Monarch gave up its right to

20  challenge the invoices.  CACI 336.

21

22      **Affirmative Defense 6: Late Notice.  Elements Required to**

23      **Establish SRS' Affirmative Defense of Late Notice**

24

25          SRS asserted this legal defense so that it can demonstrate that Monarch

26  is not entitled to challenge any amounts owed on bills which it did not challenge

27  within the ninety (90) day limit outlined in the parties' agreements.

28

**Affirmative Defense 7: Failure to Perform Contract Obligations.**
**Elements Required to Establish SRS' Affirmative Defense of**
**Failure to Perform Contract Obligations**

To prevail on its affirmative defense of failure to perform contract obligations, or its affirmative claim for relief for breach of contract, SRS must prove that: (1) SRS and Monarch entered into a contract; (2) SRS did all, or substantially all, of the significant things that the contract required SRS to do, or that SRS was excused from doing those things; (3) all conditions required by the contract for Monarch's performance had occurred or were excused; (4) Monarch failed to do something that the contract required it to do; and (5) SRS was harmed by that failure. CACI 303; <u>Reichert v. General Insurance Co.</u>, 68 Cal.2d 822, 830, 69 Cal. Rptr. 321, 325 (1968).

**Affirmative Defense 8: Proximate Cause by Monarch.  Elements**
**Required to Establish SRS' Affirmative Defense of Proximate**
**Cause by Monarch**

SRS asserted this legal defense so that it can demonstrate that Monarch's actions were the proximate cause of any purported damage suffered by Monarch.

**Affirmative Defenses 9-12: No Punitive Damages.  Elements**
**Required to Establish SRS' Affirmative Defenses re Punitive**
**Damages**

SRS asserted these legal defenses in order to challenge Monarch's factual and legal entitlement to recover punitive damages.  Monarch bears the

burden of establishing its factual entitlement, if any, to punitive damages.  SRS will challenge any showing on the facts, and in addition, shall demonstrate that punitive damages are improper as a matter of law.

These affirmative defenses are mooted by the Court's Order entering the parties' Stipulation to dismiss the second cause of action for breach of the implied covenant of good faith and fair dealing.  (ECF Doc. 39).  Monarch does not seek punitive damages under any remaining claim.

### f.   **L.R. 16-4.1(f):  Key Evidence in Support of SRS' Counterclaims and Affirmative Defenses**.

**1.   Key Evidence SRS Will Rely on In Support of its Breach of Contract Claim**.

SRS must prove the elements identified below.

**Element (1):**  SRS and Monarch entered into a contract.

**SRS' evidence in support:**  SRS will rely on the signed CSAs from 2005 and 2006, the First Amendment to the 2006 CSA and correspondence evidencing the understanding that the 2006 CSA remained in effect, and the Oral Agreement from 2009 evidencing the understanding that the contract terms remained the same, as well as other testimony and documents establishing the parties' agreements.

**Element (2):**  SRS did all, or substantially all, of the significant things that the contracts required SRS to do, or that SRS was excused from doing those things.

1    **SRS' evidence in support:**  SRS will show through testimony and
2    documents that it provided all services required of it under the parties' agreements,
3    or was excused from doing so because Monarch breached the agreements when it
4    stopped paying SRS' outstanding invoices.

5

6    **Element (3):**  All conditions required by the contract for Monarch's
7    performance had occurred or were excused.

8

9    **SRS' evidence in support:**  SRS will rely on the agreements' terms and
10   other testimony and documents to show that all conditions required by the contract
11   for Monarch's performance had been met.

12

13   **Element (4):**  Monarch failed to do something that the contract
14   required it to do.

15

16   **SRS' evidence in support:**  SRS will rely on the agreements' terms and
17   other testimony and documents to show that SRS duly performed its obligations,
18   except to the extent that they were prevented or excused by Monarch.  Among other
19   things, SRS properly administered and paid claims for benefits submitted by
20   Monarch's employees under the Policies.

21

22       SRS provided Monarch with comprehensive invoices detailing the amounts
23   due under the Claims Service Agreements and the amounts due for losses paid and
24   expenses incurred under the Policies.

25

26       Monarch breached the Claims Service Agreements and its obligations
27   by failing and refusing to pay the amounts due and owing.  As a direct and
28   proximate result of Monarch's conduct, SRS is owed in excess of $1.2 million.

-23-

**2.** **Key Evidence SRS Will Rely on In Support of its Common Claims for Money Due and Money Paid.**

SRS will show through testimony and documents that it provided all services required of it under the parties' agreements, or was excused from doing so because Monarch breached the agreements when it stopped paying SRS' outstanding invoices. SRS will show that it handled Monarch's workers' compensation claims in accordance with the parties' agreements, and performed all other services that Monarch requested in the agreements, and that Monarch now owes SRS in excess of $1.2 million. This amount includes monies paid by SRS for losses and expenses paid on Monarch's workers' claims pursuant to the Direct Bill arrangement.

**g.** **L.R. 16-4.1(g):  Other Claims** [Monarch's Affirmative Defenses to SRS' Counterclaims]

(1) Monarch asserted the following affirmative defenses to SRS' counterclaims:

**Affirmative Defense 1**: Failure to State a Cause of Action

**Affirmative Defense 2**: Ratification and Consent

**Affirmative Defense 3**: Apportionment

**Affirmative Defense 4**: Negligent Performance

**Affirmative Defense 5**: Waiver

**Affirmative Defense 6**:  Equitable Estoppel/ Promissory Estoppel

**Affirmative Defense 7**: Estoppel

**Affirmative Defense 8**: Justification

**Affirmative Defense 9**: Good Faith Assertion of Legal Right

**Affirmative Defense 10**: SRS has Sustained No Damage

**Affirmative Defense 11**: Speculative Damages

1    **Affirmative Defense 12**: Offset

2    **Affirmative Defense 13**: Statute of Limitations

3    **Affirmative Defense 14**: Laches

4    **Affirmative Defense 15**: Unclean Hands

5    **Affirmative Defense 16**: Failure to Provide Notice to Cure

6    **Affirmative Defense 17**: Excused Performance

7    **Affirmative Defense 18**: Allegations are Immaterial

8    **Affirmative Defense 19**: PES's Performance

9    **Affirmative Defense 20**: PES's Claim for Money

10   **Affirmative Defense 21**: Additional Affirmative Defense

11   **Affirmative Defense 22**: Unjust Enrichment

12   **Affirmative Defense 23**: Incorporation of Complaint Allegations

13

14            (2)      Elements Required to Establish Monarch's Affirmative Defenses

15   to SRS' Counterclaims

16

17            **Affirmative Defense 1:  Elements Required to Establish Monarch's**

18            **Affirmative Defense of Failure to State a Cause of Action**

19            This is not a viable affirmative defense.  "The defense of failure to state

20   a cause of action presents nothing to try.  No evidence is admissible, no witnesses

21   may testify.  The defense is resolved by the court on the complaint."  Schwing, A.T.,

22   California Affirmative Defenses § 9.4, p. 518 (West, 2011).

23

24            **Affirmative Defense 2:  Elements Required to Establish Monarch's**

25            **Purported Affirmative Defense of "Ratification and Consent"**

26            "Ratification and Consent" is not a valid affirmative defense to a breach

27   of contract claim.  To the extent that Monarch may contend that "ratification and

28   consent" is a form of "waiver," the elements of waiver require Monarch to prove, by

-25-

1   clear and convincing evidence, that:  (1) SRS knew Monarch was required to pay

2   SRS' invoices, and (2) SRS freely and knowingly gave up its right to have Monarch

3   pay its invoices.  A waiver may be oral or written or may arise from conduct that

4   shows that SRS gave up its right to payment.  CACI 336.

5

6                **Affirmative Defense 3:**  **Elements Required to Establish Monarch's**

7                **Purported Affirmative Defense of "Apportionment"**

8                "Apportionment" is not a valid affirmative defense.  To the extent that

9   Monarch means to contend that SRS was damaged as a result of its own negligence,

10  it must prove that (1) SRS was negligent, and (2) SRS' negligence was a substantial

11  factor in causing SRS' harm.  If Monarch proves both of these elements, then SRS'

12  damages are reduced by the court's determination of the percentage of SRS'

13  responsibility.  CACI 405.

14

15               **Affirmative Defense 4:**  **Elements Required to Establish Monarch's**

16               **Purported Affirmative Defense of "Negligent Performance"**

17               Negligence is not a valid affirmative defense to SRS' breach of contract

18  claim.  Before asserting this affirmative defense, Monarch must establish, as a

19  matter of law, that negligence is a valid and authorized defense to SRS' breach of

20  contract claim.

21

22               If Monarch is entitled to raise negligence by SRS as an affirmative

23  defense, then, in order to prevail, it must prove that (1) SRS was negligent, and

24  (2) SRS' negligence was a substantial factor in causing SRS' harm.  If Monarch

25  proves both of these elements, then SRS' damages are reduced by the jury's/court's

26  determination of the percentage of SRS' responsibility.  CACI 405.

27

28

SMRH:434853789.2                                      SRS' MEMORANDUM OF CONTENTIONS
                                                              OF FACT AND LAW

**Affirmative Defense 5:** **Elements Required to Establish Monarch's Affirmative Defense of Waiver**

To prevail on an affirmative defense of waiver, Monarch must prove, by clear and convincing evidence, that (1) SRS knew Monarch was required to pay SRS' invoices, and (2) SRS freely and knowingly gave up its right to have Monarch pay its invoices.  A waiver may be oral or written, or may arise from conduct that shows that SRS gave up its right to payment.  CACI 336.

**Affirmative Defense 6:** **Elements Required to Establish Monarch's Affirmative Defense of Equitable Estoppel/ Promissory Estoppel**

Under the doctrine of estoppel, if a party, by statements or conduct, intentionally and deliberately caused another to believe a certain thing to be true and to act on that belief, then that party cannot contradict its statements or conduct.  In order to establish the defense of equitable estoppel, Monarch must prove that: (1) SRS made a representation of fact by words or conduct intending that Monarch rely on it; (2) SRS knew the facts; (3) Monarch was ignorant of the true facts; and (4) Monarch reasonably relied on SRS' representation and was injured as a result. Cal. Evid. Code § 623; California Forms of Jury Instruction MB 300F.27, p. 3F-38 (Matthew Bender 2011); *see also* Schwing, A.T., <u>California Affirmative Defenses</u> § 34.10, p. 290 (West, 2011); *citing, inter alia,* <u>Santoro v. Carbone</u>, 22 Cal.App.3d 721, 730, 99 Cal. Rptr. 488, 494-95 (1972); *disapproved on other grounds*, <u>Tenzer v. Superscope, Inc.</u>, 39 Cal.3d 18, 30; 216 Cal. Rptr. 130 (1985).

**Affirmative Defense 7:** **Elements Required to Establish Monarch's Affirmative Defense of Estoppel**

Under the doctrine of estoppel, if a party, by statements or conduct, intentionally and deliberately caused another to believe a certain thing to be true and to act on that belief, then that party cannot contradict its statements or conduct.  In

-27-

1  order to establish the defense of equitable estoppel, Monarch must prove that:

2  (1) SRS made a representation of fact by words or conduct intending that Monarch

3  rely on it; (2) SRS knew the facts; (3) Monarch was ignorant of the true facts; and

4  (4) Monarch reasonably relied on SRS' representation and was injured as a result.

5  Cal. Evid. Code § 623; California Forms of Jury Instruction MB 300F.27, p. 3F-38

6  (Matthew Bender 2011); *see also* Schwing, A.T., <u>California Affirmative Defenses</u>

7  § 34.10, p. 290 (West, 2011); *citing, inter alia*, <u>Santoro v. Carbone</u>, 22 Cal.App.3d

8  721, 730, 99 Cal. Rptr. 488, 494-95 (1972); *disapproved on other grounds*, <u>Tenzer</u>

9  <u>v. Superscope, Inc.</u>, 39 Cal.3d 18, 30; 216 Cal. Rptr. 130 (1985).

10

11          **<u>Affirmative Defense 8</u>:  Elements Required to Establish Monarch's**

12          **Purported Affirmative Defense of "Justification"**

13          "Justification" is not a valid affirmative defense to a breach of contract

14  claim.  To the extent that Monarch may contend that "justification" is a form of

15  "waiver," the elements of waiver require Monarch to prove, by clear and convincing

16  evidence, that: (1) SRS knew Monarch was required to pay SRS' invoices; and

17  (2) SRS freely and knowingly gave up its right to have Monarch pay its invoices.  A

18  waiver may be oral or written or may arise from conduct that shows that SRS gave

19  up its right to payment.  CACI 336.

20

21          **<u>Affirmative Defense 9</u>:  Elements Required to Establish Monarch's**

22          **Purported Affirmative Defense of "Good Faith Assertion of a**

23          **Legal Right"**

24          "Good Faith Assertion of a Legal Right" is not a valid affirmative

25  defense.  It is SRS' burden, on its breach of contract claim, to establish that Monarch

26  failed to perform its obligations under the contract.  CACI 303.

27

28

1
2
3

**Affirmative Defense 10:**  **Elements Required to Establish Monarch's Purported Affirmative Defense of "SRS has Sustained No Damage"**

4   "No damages" is not an affirmative defense to SRS' breach of contract
5   claim.  Damages are an essential element to SRS' breach of contract claim.

6

7
8
9

**Affirmative Defense 11:**  **Elements Required to Establish Monarch's Purported Affirmative Defense of "Speculative Damages"**

10   "Speculative damages" is not an affirmative defense to SRS' breach of
11   contract claim.  Damages are an essential element to SRS' breach of contract claim.

12

13
14

**Affirmative Defense 12:**  **Elements Required to Establish Monarch's Affirmative Defense of Offset**

15   In order to establish its affirmative defense of set-off, Monarch must
16   prove that (1) SRS owes Monarch money, and (2) the amount.  If Monarch meets
17   that burden, the amount proven may be set-off against amounts that Monarch owes
18   to SRS.  Cal. Code Civ. Proc. § 431.70.

19

20
21

**Affirmative Defense 13:**  **Elements Required to Establish Monarch's Affirmative Defense of Statute of Limitations**

22   In order to establish its affirmative defenses under statutes of
23   limitations, Monarch must prove that SRS filed its counterclaims after expiration of
24   applicable statutes of limitations, including, among others, four years for actions for
25   breach of written contract and declaratory relief as to such a contract.  Cal. Code
26   Civ. Proc. § 337.

27

28

**Affirmative Defense 14:** Elements Required to Establish Monarch's Affirmative Defense of Laches

To prevail on its laches defense, Monarch must prove that (1) SRS delayed the assertion of a right; (2) for some appreciable period; and (3) Monarch would be prejudiced if SRS' assertion of the right is permitted.  Stafford v. Ballinger, 199 Cal.App.2d 289, 296 (1962).

**Affirmative Defense 15:** Elements Required to Establish Monarch's Affirmative Defense of Unclean Hands

To prevail on its unclean hands defense, Monarch must prove that (1) SRS' conduct was unconscionable and resulted in prejudice to Monarch, and (2) SRS' misconduct was intimately connected with SRS' claims of breach of contract and of such a prejudicial nature that it would be unfair to allow SRS to recover for Monarch's breach of contract.  California Forms of Jury Instruction MB 300F.29, p. 3F-43 (Matthew Bender 2011); *see also* Schwing, A.T., California Affirmative Defenses § 45:18, p. 1290 (West, 2011); *citing* Lynn v. Duckel, 46 Cal.2d 845, 850 (1956); Watson v. Poore, 18 Cal.2d 302, 313 (1941); Health Maintenance Network v. Blue Cross of So. Cal., 202 Cal.App.3d 1043, 1061, 249 Cal. Rptr. 220, 232 (1988); Seligman v. Tucker, 6 Cal.App.3d 691, 700, 86 Cal. Rptr. 187, 192-93 (1970); Fiberboard Paper Products Corp. v. East Bay Union of Machinists, 227 Cal.App.2d 675, 727-28, 39 Cal. Rptr. 64, 96-97 (1964); Moriarty v. Carlson, 184 Cal.App.2d 51, 56, 7 Cal. Rptr. 282, 284-85 (1960).

**Affirmative Defense 16:** Elements Required to Establish Monarch's Purported Affirmative Defense of Failure to Provide Notice to Cure

"Failure to Provide Notice to Cure" is not a valid affirmative defense. To the extent that Monarch may contend "Failure to Provide Notice to Cure" is a

-30-

Case No. CV11-01764 DSF (AGR)

SRS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

form of "unclean hands," Monarch must prove that (1) SRS' conduct was unconscionable and resulted in prejudice to Monarch, and (2) SRS' misconduct was intimately connected with SRS' claims of breach of contract and of such a prejudicial nature that it would be unfair to allow SRS to recover for Monarch's breach of contract.  California Forms of Jury Instruction MB 300F.29, p. 3F-43 (Matthew Bender 2011); *see also* Schwing, A.T., California Affirmative Defenses § 45:18, p. 1290 (West, 2011); *citing* Lynn v. Duckel, 46 Cal.2d 845, 850 (1956); Watson v. Poore, 18 Cal.2d 302, 313 (1941);  Health Maintenance Network v. Blue Cross of So. Cal., 202 Cal.App.3d 1043, 1061, 249 Cal. Rptr. 220, 232 (1988); Seligman v. Tucker, 6 Cal.App.3d 691, 700, 86 Cal. Rptr. 187, 192-93 (1970); Fiberboard Paper Products Corp. v. East Bay Union of Machinists, 227 Cal.App.2d 675, 727-28, 39 Cal. Rptr. 64, 96-97 (1964); Moriarty v. Carlson, 184 Cal.App.2d 51, 56, 7 Cal. Rptr. 282, 284-85 (1960).

**Affirmative Defense 17:  Elements Required to Establish Monarch's Purported Affirmative Defense of Excused Performance**

"Performance excused" is not a valid affirmative defense to a breach of contract claim.

**Affirmative Defense 18:  Elements Required to Establish Monarch's Purported Affirmative Defense of "Allegations are Immaterial"**

"Allegations are Immaterial" is not a valid affirmative defense to a breach of contract claim.

**Affirmative Defense 19:  Elements Required to Establish Monarch's Purported Affirmative Defense of "PES' Performance"**

"PES' Performance" is not a valid affirmative defense to a breach of contract claim.

**Affirmative Defense 20:  Elements Required to Establish Monarch's Purported Affirmative Defense of "PES' Claim for Money"**

"PES' Claim for Money" is not a valid affirmative defense.  To the extent Monarch may contend "PES' Claim for Money" is a form of "Offset," Monarch must prove that (1) SRS owes Monarch money, and (2) the amount.  If Monarch meets that burden, the amount proven may be set-off against amounts that Monarch owes to SRS.  Cal. Code Civ. Proc. § 431.70.

**Affirmative Defense 21:  Elements Required to Establish Monarch's Purported Affirmative Defense of "Additional Affirmative Defense"**

"Additional Affirmative Defense" is not a valid affirmative defense.

**Affirmative Defense 22:  Elements Required to Establish Monarch's Affirmative Defense of Unjust Enrichment**

"Unjust Enrichment" is not a valid affirmative defense, or even a cause of action, but rather "a general principle, underlying various legal doctrines and remedies."  McBride v. Boughton, 123 Cal.App.4th 379, 387 (2004).  To the extent Monarch may contend "Unjust Enrichment" is a form of "Offset," Monarch must prove that (1) SRS owes Monarch money, and (2) the amount.  If Monarch meets that burden, the amount proven may be set-off against amounts that Monarch owes to SRS.  Cal. Civ. Code Proc. § 431.70.

1 | **Affirmative Defense 23:** **Elements Required to Establish**
2 | **Monarch's Purported Affirmative Defense of "Incorporation of**
3 | **Complaint Allegations"**
4 | "Incorporation of Complaint Allegations" is not a valid affirmative
5 | defense.
6 |
7 | (2)   Summary of Key Evidence SRS Will Rely on in Opposition to
8 | Monarch's Affirmative Defenses
9 | The key evidence SRS will rely upon to oppose Monarch's affirmative
10 | defenses to SRS' counterclaims is the same key evidence that supports SRS'
11 | opposition to Monarch's claims [L.R. 16-4.1(c), above] and its own affirmative
12 | counterclaims against Monarch [L.R. 16-4.1(f), above].
13 |
14 | **h.**   **L.R. 16-4.1(h):  Identification of Anticipated Issues**
15 | **Regarding Evidence, and SRS' Position as to Those Issues**
16 |
17 | **1.**   **Monarch's Burden of Proving Claims Mishandling.**  In this
18 | case, Monarch contends that SRS mishandled 47 workers' compensation claims.
19 | Each of those claims involves a separate claim file, containing separate and different
20 | factual and legal issues and disputes, including but not limited to different injuries,
21 | claims, investigations, medical issues, incurred losses, reserves, payments, claim
22 | adjusters, attorneys and underlying administrative law judges.  As discussed below,
23 | SRS' position is that Monarch must prove its claims mishandling allegations for
24 | each and every separate claim file that it has put at issue.  As a matter of due process
25 | and well-established law, Monarch is not entitled to extrapolate, from a
26 | demonstration of claims mishandling in one file or a "sample" of files, any
27 | conclusions about the handling of other files for which it has not submitted separate
28 | and sufficient evidence of claims mishandling.

2.      **Preserving Confidentiality of Private Claims Information At Trial.**  The at-issue claim files were produced under a Protective Order, and SRS has designated the files "confidential."  In connection with the Parties' trial preparation, and in preparing to offer claim file documents as evidence at trial, the Parties need to develop a method for preserving the confidentiality of the claim files.

3.      **Monarch's Failure to Provide Any Evidence of Damages.** SRS will prove at trial that, even if Monarch's experts' claims mishandling criticisms are 100% accurate, Monarch would *still* be in arrears for roughly $1.1 million. Monarch has no damages in this case because SRS' alleged breach did not cause Monarch to suffer any economic loss.  Monarch stopped paying SRS' invoices long ago, and it has no evidence that it overpaid SRS by any amount.

4.      **Monarch's Attempt to Introduce Evidence that Contradicts the Terms of the Parties' Agreements.**  Many of the purported damages claimed by Monarch in this case arise out of its medical cost containment fees, the method for which was established in the parties' CSAs.  Monarch argues that SRS should have applied a different method in charging Monarch for these costs.  SRS' position is that Monarch agreed to and understood the "27% cost of savings" term in the contracts, and cannot now challenge it because it wishes it had chosen another option.  In addition, the 2005 and 2006 CSAs contain a ninety-day (90) challenge provision to which Monarch agreed, which stated that Monarch had to challenge any bill in writing within ninety (90) days of the date the amount was due SRS.  SRS takes the position that Monarch has waived the right to challenge any amounts due under bills which were not challenged according to this provision.  SRS should not be allowed to introduce any parol evidence or other evidence that contradicts the unambiguous terms of the contracts.

SMRH:434853789.2

**i.** **L.R. 16-4.1(i):  Identification of Issues of Law Germane to the Case, and SRS' Position as to Those Issues**.

(1)  Monarch cannot contradict the terms of the Medical Bill Repricing ("MBR") Provisions of the CSAs.

Many of the purported damages claimed by Monarch in this case arise out of its medical cost containment fees, the method for which was established in the parties' CSAs.  Monarch argues that SRS should have applied a different method in charging Monarch for these costs.  SRS' position is that Monarch agreed to and understood the "27% cost of savings" term in the contracts, and cannot now challenge it because it wishes it had chosen another option.

(2)  Monarch waived its right to challenge any amounts owed under bills that were not challenged within ninety days.

The CSAs and Amendment No. 1 required Monarch to notify SRS, in writing, of any disputes relating to billed amounts on claims within 90 days after the date payment was due SRS.  They explicitly stated that, if Monarch failed to notify SRS of any dispute in writing within 90 days, it waived its right to dispute the bill.  Monarch has waived its right to dispute the amounts owed on any invoices about which it failed to complain, in writing, within 90 days of the due date.

For example, SRS will show that it provided a number of invoices to Monarch's broker, Peggy Drew, in July of 2009.  To the extent Monarch failed to dispute any or all of those bills within 90 days of the date payment was due, Monarch still owes SRS all amounts stated on the invoices plus late fees.

(3)     <u>Monarch's Unfair Competition Law ("UCL") claim fails as a matter of law</u>.

Monarch's UCL claim is based upon three separate purportedly unfair business practices: 1) SRS mishandled and overpaid claims made under Monarch's workers' compensation Policies in such a manner as to artificially increase Monarch's collateral requirements and premiums for which it seeks restitution; 2) SRS' charging Monarch under the bill review formula set forth in the CSAs for which Monarch seeks restitution; and 3) SRS alleged refusal to comply with California Labor Code Section 3762 for which Monarch seeks an injunction.

**A.      <u>Monarch Lacks Standing to Assert a UCL Claim for Restitution</u>**

Monarch lacks standing to pursue its UCL claim.  Under the UCL, a plaintiff must allege that it "suffered injury in fact **and** has lost money or property **as a result of** such unfair competition."  Cal. Bus. & Prof. Code § 17204 [emphasis added]; <u>Californians for Disability Rights v. Mervyn's, LLC</u>, 39 Cal.4th 223, 228 (2006).  A plaintiff lacks standing to bring a UCL claim unless it has suffered losses that would entitle it to restitution.  To recover under the UCL, a plaintiff "must demonstrate some form of economic injury" that "was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." <u>Kwikset Corp. v. Superior Court</u>, 51 Cal.4th 310, 322-323 (2011) [emphasis in original]; Only the equitable remedies of restitution and/or injunctive relief are available under the UCL.  <u>See</u> Cal. Bus. & Prof. Code § 17203; <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal.4th 1134, 1144 (2003).

Under the UCL, compensatory damage claims do not qualify as "restitution" claims sufficient to confer standing.  To the contrary, California courts strictly limit monetary remedies available under the UCL to restitution, and ***do not allow for the recovery of compensatory damages***.  <u>Cel-Tech Communications v.</u>

1  L.A. Cellular Telephone Co., 20 Cal.4th 163, 179 (1999); Bank of the West v.

2  Superior Court, 2 Cal.4th 1254, 1266, 1273 (1992).

3       Under the UCL, restitution means "the return of money or property that

4  was once in [the plaintiff's] possession" or money in defendant's possession in which

5  the plaintiff has a present "vested ownership interest."  Korea Supply Co. v.

6  Lockheed Martin Corp., supra, 29 Cal.4th at 1149; Cortez v. Purolator Air Filtration

7  Products Co., 23 Cal. 4th 163, 172 (2000); Day v. AT&T Corp., 63 Cal.App.4th

8  325, 340 (1998) (restitution means that "[t]he offending party must have obtained

9  something to which it was not entitled *and* the victim must have given up something

10  which he or she was entitled to keep" [emphasis in original]).  As set forth below,

11  Monarch has not, and cannot, meet the stringent standing requirement under the

12  UCL.

13

14       **1.    Monarch lacks standing because it suffered no injury in fact**

15       Under the UCL, "the ***actual payment*** of money by a plaintiff"

16  constitutes an "injury in fact."  Troyk v. Farmers Group, Inc., 171 Cal.App.4th 1305

17  (2009).  Monarch has not parted with the money it seeks to recover as restitution

18  under its UCL claim.  To the contrary, it has not paid the SRS invoices that are at

19  issue.

20       In its first UCL claim, Monarch contends that SRS' claims handling

21  resulted in artificial increases in the collateral and premium obligations that ***it owes***

22  ***to AIG***.  Monarch's allegations establish that AIG, not SRS, purportedly benefitted –

23  through the possibility of higher premiums and collateral requirements – from SRS'

24  alleged mishandling.  Monarch's allegations concede that any payments were made

25  to AIG.[5]  Monarch's admission that AIG, not SRS, received the alleged illicit profits

26

27  ─────────────────

28  [5]    Although Monarch has become indebted to AIG and SRS, it has not actually paid
       all of the losses and expenses incurred for its workers' compensation claims.

from SRS' misconduct confirms that Monarch has not suffered an injury-in-fact for which it can recover against SRS.

In its second UCL claim, Monarch alleges that it was overcharged for bill review fees.  While it is true that Monarch was invoiced for medical bill review expenses, in accordance with the CSAs, the undisputed evidence is that Monarch *has not paid SRS* for the allegedly overbilled fees.  Because it has not yet parted with the amounts it seeks to recover, it has not made an *actual payment* of money, has not suffered injury in fact, and lacks standing to pursue its UCL claim.

2. <u>**Monarch has not adequately alleged the loss of money or property subject to restitution**</u>

Monarch does not allege that it lost any money or property *as a result* of SRS' alleged wrongful conduct in handling Monarch's claims.  Although it alleges that SRS mishandled its claims, it does not allege, nor can it, that it gave money or property to SRS as a result of the claims handling.  There is simply no factual allegation supporting a restitution claim.  See <u>Day v. AT&T</u>, 63 Cal.App.4th 325, 340 (1998) (noting that the Legislature used the word "restore" meaning "[t]o give back, to make return or restitution of' anything previously taken away or lost").

Monarch's claim fails for lack of allegations or evidence that SRS has garnered illicit profits as a result of any claims handling or mishandling.  To the extent that Plaintiff alleges it suffered "inflated premiums" or increased collateral requirements, Monarch concedes that *it does not owe and did not pay SRS* any of those amounts.

Likewise, Monarch's claim for overbilled medical review expenses fails to sufficiently allege the loss of money or property subject to restitution.  Despite Monarch's allegations, SRS billed Monarch in exact compliance with the written provisions of the CSAs.  Yet, Monarch has persistently refused to pay SRS its invoiced Service Fees or to reimburse the invoiced losses and expenses incurred for

1   Monarch's workers' compensation claims.  Until and unless Monarch actually parts

2   with money or property as a result of SRS' allegedly wrongful conduct, it cannot

3   maintain a UCL claim for restitution.

4

5   **B.      Monarch Is Not Entitled to Restitution on any of its UCL Claims**

6               Restitution is appropriate only "as may be necessary to restore . . . any

7   money or property . . . acquired by means of such unfair competition."  Restitution

8   is only available as "disgorgement of money that has been wrongfully obtained"

9   from an unfair business practice.  Bank of the West v. Superior Court (Industrial

10  Indemnity Co.), 2 Cal.4th 1254, 1266 (1992); Dinosaur Development, Inc. v. White,

11  216 Cal.App.3d 1310, 1315 (1989) ("restitution" refers to the "return or restoration

12  of a specific thing or condition").  The remedy is meant to prevent "unjust

13  enrichment," meaning the "result or effect of a failure to make restitution of or for

14  property or benefits received under such circumstances as to give rise to a legal or

15  equitable obligation to account therefor."  Id.

16              Monarch is not entitled to "restitution."  The evidence establishes that

17  Monarch owes SRS $1.1 million dollars for unpaid Service Fees and losses and

18  expenses invoiced on its claims.  Whether Monarch's debt results, as it alleges, from

19  SRS' alleged claim mishandling is irrelevant to its restitution claim, because

20  Monarch has not ***paid*** the medical bill repricing costs for which it suggests its

21  entitled to restitution.  Monarch's mere indebtedness to AIG or SRS for certain

22  amounts does not entitle it to restitution or disgorgement of yet to be received

23  profits.  Restitution is therefore not an available remedy.  Monarch's UCL claim

24  arising out of the alleged mishandling of Monarch's claims and medical bill

25  repricing therefore fail as a matter of law.

26

27

28

1    **C.    <u>Monarch Is Not Entitled To An Injunction</u>**

2           The primary jurisdiction doctrine bars injunctive relief under the UCL

3    when the practice sought to be enjoined implicates expertise better suited to

4    administrative oversight.  <u>See</u>, <u>e.g.</u>, <u>Jonathan Neil & Assoc., Inc. v. Jones</u>, 33

5    Cal.4th 917, 931-932 (2004) (primary jurisdiction barred injunctive relief claim

6    regarding insurance premium billing dispute); <u>Farmers Ins. Exch. v. Sup. Ct.</u>, 2

7    Cal.4th 377, 401 (1992) (same, regarding good driver discounts in automobile

8    insurance case); <u>see</u> <u>also</u> <u>Desert HealthCare Dist. v. PacificCare FHP, Inc.</u>, 94

9    Cal.App.4th 781, 795-796 (2001) (abstaining from issuing an injunction involving

10   appropriate levels of capitation charges in the heavily regulated health care finance

11   industry).

12          TPAs, such as SRS, are heavily regulated by the California Department

13   of Industrial Relations, and are subject to training and other requirements.  Cal. Lab.

14   Code § 3702.1.  TPAs are also subject to penalties and fines, and can be audited by

15   the Department of Industrial Relations.  Cal. Lab. Code § 3702.7; §§ 129, 129.5.

16          Here, any conceivable injunctive relief would require the Court to

17   supervise TPA practices that are far better suited to regulatory expertise and

18   oversight.  Monarch contends that SRS engaged in unfair business practices based

19   on the manner in which SRS incurred bill review costs and charged Monarch for

20   medical bill repricing.  Any injunctive relief would require the Court to supervise

21   SRS' CSAs and determine whether SRS is following accepted standards and

22   guidelines when conducting its medical bill repricing functions.  Such injunctive

23   relief would pull the Court "deep into the thicket" of the heavily regulated TPA

24   industry, and would require determinations that are better suited for administrative

25   expertise.  <u>See</u> <u>Desert HealthCare Dist.</u>, 94 Cal.App.4th at 796.

26

27

28

1      (4)     SRS Is Entitled to Recover its Attorneys' Fees in this

2  Action.

3          The 2005 and 2006 CSAs state that "[i]n any litigation or arbitration

4  between the parties, the prevailing party shall be entitled to reasonable attorneys'

5  fees and all costs incurred in enforcing this Agreement."  California law permits

6  enforcement of attorneys' fees provisions in contract disputes.  Cal. Civil Code

7  § 1717; see In re Tobacco Cases I, 193 Cal.App.4th 1591 (2011).  As a result, if

8  SRS prevails in this action, it is entitled to reasonable attorneys' fees per the parties'

9  agreement.

10

11      (5)     SRS Is Entitled to Late Fees.

12          The 2005 and 2006 CSAs also state that [i]f balances are not received

13  in full by SRS within thirty (30) days of the billing date or within 72 hours of the

14  bill issuance … [Monarch] will pay SRS a late charge of one and one-half percent

15  (1.5%) of the outstanding bill for each subsequent thirty-day period or any part

16  thereof until SRS receives all amounts due."  As a result, SRS is entitled to late fees

17  of 1.5% per month on each bill that is more than 30 days overdue.

18

19                              **III.**

20                  **L.R. 16-4.2** [Abrogated]

21

22

23                              **IV.**

24          **L.R. 16-4.3: BIFURCATION OF ISSUES**

25          SRS requests that the court phase the trial in order to determine certain

26  overarching contract interpretation issues before embarking on a claim-by-claim

27  analysis.  Many of the purported damages claimed by Monarch in this case arise out

28  of its medical cost containment fees, the method for which was established in the

1   parties' CSAs.  Monarch argues that SRS should have applied a different method in

2   charging Monarch for these costs.  SRS' position is that Monarch agreed to and

3   understood the "27% cost of savings" term in the contracts, and cannot now

4   challenge it because it wishes it had chosen another option.

5

6          In addition, the 2005 and 2006 CSAs contain a ninety-day (90)

7   challenge provision to which Monarch agreed, which stated that Monarch had to

8   challenge any bill in writing within ninety (90) days of the date the amount was due

9   SRS.  SRS takes the position that Monarch has waived the right to challenge any

10   amounts due under bills which were not challenged according to this provision.

11

12          SRS has filed Motions *in Limine* on these two issues, and it would

13   greatly assist the parties and the Court to determine these broad legal issues before

14   assessing the individual claims.

15

16                                **V.**

17                    **L.R. 16-4.4: JURY TRIAL**

18          The parties have waived the right to a trial by jury.

19

20                                **VI.**

21                  **L.R. 16-4.5: ATTORNEYS' FEES**

22          The 2005 and 2006 CSAs state that "[i]n any litigation or arbitration

23   between the parties, the prevailing party shall be entitled to reasonable attorneys'

24   fees and all costs incurred in enforcing this Agreement."  California law permits

25   enforcement of attorneys' fees provisions in contract disputes.  Cal. Civil Code

26   § 1717; see In re Tobacco Cases I, 193 Cal.App.4th 1591 (2011).  As a result, if

27   SRS prevails in this action, it is entitled to reasonable attorneys' fees per the parties'

28   agreement.

# VII.

## <u>L.R. 16-4.6 ABANDONMENT OF ISSUES</u>

None.

DATED:  November 13, 2014

SHEPPARD MULLIN RICHTER & HAMPTON LLP


By  _____/s/ Justine M. Casey_____
     JUSTINE M. CASEY

Attorneys for Defendant and Counter-Claimant
SPECIALTY RISK SERVICES, LLC
